IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ARLING OLSON,

                        Plaintiff,

        v.

TIMOTHY MOORE,
in his individual capacity,

                       Defendant.

OPINION AND ORDER

10-cv-199-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Arling Olson and defendant Timothy Moore competed in the race for Polk County Sheriff in 2006, when plaintiff was a deputy sheriff for the county and defendant was acting as the interim sheriff until the next election. Plaintiff lost that election; defendant won. Plaintiff alleges in this lawsuit brought under 42 U.S.C. § 1983 that during the campaign and after the election, defendant engaged in a string of adverse actions against him because of activities protected by the First Amendment, culminating in criminal charges against plaintiff for perjury and obstruction of justice. (The circuit court later dismissed both charges for lack of evidence.) Defendant's motion for summary judgment is ready for decision.

1

This is the second case filed in this court involving allegations that defendant retaliated against an employee for opposing him in the election.  In Cockroft v. Moore, 638 F. Supp. 2d 1024 (W.D. Wis. 2009), another deputy sheriff for Polk County alleged that defendant retaliated against him by changing his assignment and reducing his responsibilities.   I granted defendant's motion for summary judgment in Cockroft, concluding that defendant was entitled to qualified immunity because it was not clearly established that the First Amendment prohibited him from relying on political reasons in making the decisions at issue.

I reach the same conclusion in this case with respect to plaintiff's claim that defendant retaliated against him by reassigning him and denying him a promotion.  With respect to several other alleged acts, plaintiff has failed to show that they would deter a person of ordinary firmness from exercising his constitutional rights or that defendant was personally involved in those acts.

However, I conclude that plaintiff may proceed to trial on his claim that defendant retaliated against him by conducting an internal investigation of plaintiff and then urging the district attorney in multiple letters to charge plaintiff with perjury and obstruction of justice. A reasonable jury could find that defendant was less concerned about plaintiff's possible violations of the law and more concerned about getting revenge against plaintiff for his speech, in light of a number pieces of evidence: the suspicious timing of the investigation,

2

the obvious conflict of interest present in defendant's involvement with the investigation, his zeal in seeking plaintiff's prosecution and the statements he made about his motivation in his letters to the district attorney. Although much of this evidence suggests that defendant may have been retaliating against plaintiff for his participation in a criminal investigation against defendant rather than for plaintiff's campaign, defendant does not object to the inclusion of that theory in the case or argue that plaintiff's participation in the investigation is not protected by the First Amendment.

After the parties completed briefing on defendant's motion, plaintiff filed a motion for leave to file a declaration that addresses a number of matters defendant raised in his reply brief. In particular, defendant asked the court to disregard a number of documents filed with plaintiff's opposition materials because they had not been produced in discovery. I am denying plaintiff's motion as unnecessary because the documents in dispute would have no effect on defendant's summary judgment motion regardless whether they were filed properly.

From the parties' proposed findings of fact and the record, I find that the following facts are undisputed.

## UNDISPUTED FACTS

### A.  The Sheriff's Race

The Polk County Sheriff's Department has 77 employees, 29 of whom are law

3

enforcement officers.  In 2005, Ann Hraychuck resigned from her position as Polk County Sheriff before the completion of her term.  Plaintiff Arling Olson (a deputy sheriff in the department), defendant Timothy Moore (a lieutenant in the department) and six others filed applications with the governor to be appointed for the last year of Hraychuck's term.  The governor appointed defendant in December 2005.

The following year both plaintiff and defendant campaigned for sheriff.  Plaintiff took an unpaid leave of absence from his job during the campaign.  Both plaintiff and defendant used photos of themselves in uniform as part of their campaign materials.  Under department policy 200-1-2, "[n]o employee may use department, time, material or resources for any other purpose than to carry out department business and to further the department's goals and objectives without permission from the Sheriff or Chief Deputy."  Deputies purchase their own uniforms and keep them after they leave the employment of the sheriff's department.

In June 2006 defendant asked Brent Waak, a sergeant, to conduct an investigation about a gun that plaintiff had purchased in 2003 from the daughter of a man who had committed suicide.  The matter "was closed" on July 5, 2006 and no disciplinary action was taken against plaintiff.

In September 2006 defendant defeated plaintiff in the primary election and then won the general election in November 2006.

4

B. <u>Plaintiff's Experiences at Work after the Election</u>

On November 16, 2006, defendant called a meeting with the deputy sheriffs during which he "invited" any deputies who had previously said they could not work for him to resign.  (The parties dispute whether any deputies in fact had made such statements.)  No deputy resigned in response to defendant's invitation.

Also at the meeting defendant reassigned plaintiff and Jared Cockroft from their duties as patrol officers.  Plaintiff's new assignment was civil process server; Cockroft's was a school liaison officer.  Cockroft had supported plaintiff rather than defendant in the sheriff's election.  (When asked why he reassigned plaintiff, defendant said that it was "a spot where we can monitor his work product" because "he failed miserably as an investigator."  Def.'s Dep., dkt. #33-1, at 125.)  As a result of plaintiff's reassignment, he received a pay increase of $.60 an hour and a schedule that did not involve working on weekends.  As a civil process server, plaintiff could not receive overtime pay "for attending court appearances" and could not "bid on extra shifts" as he could as a patrol deputy.

After the November 16 meeting, defendant told plaintiff that he would be ordering an investigation regarding plaintiff's use of his uniform in campaign photos.  However, defendant did not take further action on this matter.

In December 2006 plaintiff applied for a promotion as a field services lieutenant.  A four-member panel that included defendant agreed unanimously to give the promotion  to

5

another candidate.

In February 2007 defendant received an email from the district attorney's office because that office had not received a response to an information request it had sent to plaintiff in August 2006.  Defendant forwarded the email to Lieutenant Steve Smith and told him to ask plaintiff why he failed to respond to the request.  Plaintiff told Smith that he did not receive the request because he was on a leave of absence at the time.  Neither defendant nor anyone else took disciplinary action against plaintiff related to this incident.

In February 2007 plaintiff worked overtime hours before requesting permission for doing so.  (The parties dispute whether any policy required plaintiff to seek preapproval.)  On February 12, 2007, Lieutenant Smith sent plaintiff an email in which he wrote, "You have to call and request O.T. before you work it."  (The parties dispute whether Smith required anyone else to get preapproval and whether Smith later denied any requests by plaintiff to work overtime.)

Beginning on April 12, 2007 Smith began requiring plaintiff to begin work at 1:00 p.m. on some days.  No other officers were required to do this.  (The parties dispute how often plaintiff was required to work this shift.  I assume that plaintiff normally worked a traditional eight-hour shift that began in the early morning and ended in mid-afternoon and that the later start time meant a later finish time as well, though the parties do not directly address this issue.)  On April 27, 2007, after plaintiff complained, Smith changed plaintiff's

6

schedule back to the way it was.  In July 2008, Smith again began requiring plaintiff to begin work at different times. (The parties dispute whether Smith knew at the time that plaintiff was enrolled in college classes in the evening.)  When plaintiff complained to Smith about this in October 2008, Smith said, "My hands are tied."

Smith told Sergeant Waak  that he "was overridden" by defendant when Smith tried to adjust sergeants' schedules to avoid requiring them to "work days and nights in the same week."  Waak Dep., dkt. #22, at 14.  In one instance, defendant reprimanded Waak for "checking in" too early.  Defendant told Timothy O'Hare that he wanted sergeants to work a "rotating" schedule of "one month of days, one month of splits, one month nights." O'Hare Dep. dkt. #23, at 25.

In May 2007 plaintiff asked Smith for permission to attend a legal training session, but Smith refused.

Plaintiff was not issued a radar unit for his vehicle or a taser to carry on his person and he has not requested either piece of equipment.  As a civil process server, he does not need a radar unit to carry out his duties.  Smith is responsible for issuing equipment to officers, including radar units and tasers. Defendant has no involvement in those matters. In two instances, Smith has "chastised" plaintiff for "failing to respond to traffic stops." Olson Decl. ¶ 25, dkt. #30.

C.  Investigations of the May 3, 2002 Interview

In 2007, the district attorney's office was investigating whether defendant had violated the law by videotaping an interview with a suspect on May 3, 2002.  Plaintiff and Cockroft conducted the interview of the suspect, who agreed to provide the statement on the condition that it be "off the record."   Defendant and Sergeant Ray Joy observed the interview on a monitor in plaintiff's office.

During the course of the interview, someone turned on video recording equipment that could be controlled only from plaintiff's office, recording part of the interview. (Defendant says that he has "no recollection of any involvement in the recording" of the interview.)  The label on the videotape is in plaintiff's handwriting and states that "917" and "903" made the recording; these numbers refer to the badge numbers of defendant and Sergeant Joy.  Plaintiff prepared and signed an evidence tag for the tape; the tag is dated May 3, 2002.  On June 4, 2002, plaintiff provided a copy of the tape to the Federal Bureau of Investigation. (Plaintiff says that he did not learn that the interview had been recorded until the suspect's lawyer told him about it "[w]ithin a couple of months" after the interview. Plt.'s Dep., dkt. #24, at 133.)

On November 18, 2002, plaintiff testified at the sentencing hearing after the suspect was convicted.  When plaintiff was asked whether he knew while he was conducting the interview that it was being taped, he said he did not.  In response to the question, "Did you

8

learn subsequently through the federal investigation that the interview had been videotaped and was used to assist the federal authorities in their investigation," he said, "Yes, sir, I did." In a written statement to the Wisconsin Department of Criminal Investigations, dated January 15, 2007, plaintiff wrote the following:

> I had no idea Lt. Moore and Investigator Joy were monitoring the interview with Johnson and his attorney.  I also didn't know why they would be observing the interview, but assumed it was just out of curiosity.  I had given no one permission to surreptitiously monitor the interview or to make any type of recording of it.  Especially after assuring [the suspect's lawyer] the interview with he and his client was "off the record."

> I gave the matter no further thought until November 18, 2002 when I was testifying under oath at [the] sentencing hearing being held in Branch II of the Polk County Circuit Court.  During my testimony during this sentencing hearing, [the lawyer] asked me if I was aware our interview was being monitored and recorded.  I testified that I did not. [The lawyer] then asked me if I gave anyone my consent or permission to record or monitor our interview. I answered, "Absolutely not."

No charges were filed against defendant.

At some time during his term (the parties do not say when), defendant began an investigation to determine whether plaintiff lied while testifying at the November 2002 sentencing hearing.  Defendant sent a letter to the district attorney's office dated April 3, 2008, with the subject line, "Re: Review for Criminal Charges of Perjury 946.31(1)(a)."  In the letter, defendant alleged that  plaintiff lied at the sentencing hearing when he testified that he did not know while he was conducting the May 3, 2002 interview that it was being

9

taped.  In particular, defendant alleged that plaintiff's testimony had "the sole purpose to support his claims to defame and cast doubt as to the credibility of Investigator Ray Joy and myself."  With the letter, defendant included "documentation of written statements by" plaintiff and "reports" from the Wisconsin Department of Criminal Investigations. (Defendant does not identify specifically in his proposed findings of fact the evidence he gave the district attorney.)  Defendant did not provide the videotape or the label that was on it and he did not inform the district attorney that he was responsible for the videotaping or that the label identifies him that way.  However, he wrote that the tape includes the label "Interview Tape—Tryn Johnson—w/ atty Mark Gehrity—by 912—and 917.  The last number appears to be 917 or could be 919."   In addition, he wrote that "[t]he assigned badge number for Arling Olson is 912.  The assigned badge number for Ray Joy is 917.  The assigned badge number for Jared Cockroft was 919."  (In fact, the label lists badge numbers 917 and *903* (defendant's badge number), not 912 (plaintiff's badge number)).

On June 17, 2008, plaintiff was interviewed as part of the department's internal investigation.  Plaintiff was asked whether he had acquired the case file for the state investigation against defendant, whether he had made copies of the file and whether he had distributed it.

On August 26, 2008, defendant sent a second letter to the district attorney, this time with the subject line, "Second Request, Review of Charges for Perjury 946.31(1)(a) and

10

Obstructing an Officer, 946.41(1)(2)b." Defendant acknowledged in the letter that he had "a vested interest in this case as Deputy Arling Olson, and others have conspired to have me charged not only through State Court, but also through the Federal Court system."

On September 3, 2008, defendant provided a copy of the videotape to the district attorney. Defendant did not explain that the reference to "903" on the label was a reference to him. He did not provide "information relating to the Department's internal investigation (or employment interview)."

In October 2008, plaintiff was charged with perjury before a court under Wis. Stat. § 946.31(1)(a) and obstructing an officer under Wis. Stat. § 946.41(1). (The perjury charge was for plaintiff's testimony at the November 2002 sentencing hearing; the obstruction charge was for his statement to the Wisconsin Department of Criminal Investigations.) The criminal complaint contains the allegation that plaintiff's badge number is 917, which is one of the numbers on the videotape's label. Sergeant Joy's badge number is 917; plaintiff's is 912. As a result of these charges, plaintiff was placed on administrative leave.

The circuit court dismissed the charges after a preliminary hearing, adding these remarks:

> Having reviewed the file, proceedings and record herein, including the preliminary hearing transcripts and Johnson's sentencing hearing transcript, the Court is of the opinion that the evidence contained in the record is wholly insufficient to conclude that Olson probably committed a felony. The State failed to present a believable or plausible account that Olson engaged in felony

11

false swearing, obstructed any officer, or otherwise committed any criminal offense. State v. Koch, 175 Wis. 2d 684, 704, 499 N.W.2d 152 (1993), Accordingly, his motion to dismiss is granted. Even after construing all reasonable inferences in favor of the State's version of the events, it is clear that there exists no plausible account of a felony being committed. To the contrary, what the evidence showed is that the recording equipment in the Polk County Sheriff's Department was located in a separate room from where the interview of Johnson took place and could not be activated by anyone in the interview room. Johnson, Attorney Gherty, the District Attorney, Cockroft and Olson were present in the interview room at all relevant times. The videotape recording was clearly initiated by someone other than Johnson, Attorney Gherty, the District Attorney, Cockroft or Olson after the interview began: an act Olson was incapable of committing. While it is uncertain exactly when Olson learned about the existence of the videotape, it is crystal clear that he was unaware of it at the time it was recorded and had nothing to do with the recording. Olson testified truthfully in this regard at Johnson's sentencing hearing and was candid and honest at all times with Agent Pulver in the course of the federal investigation. The State's interpretation of the chain of custody evidence and its importance to Olson's veracity hinges on semantics and is unpersuasive and lacking in plausibility. While Olson was adamant in his denial of wrongdoing and always has been, neither Sheriff Moore nor Deputy Joy denied making the recording. They simply told Agent Sogla that they "didn't remember." As to Olson's statements in the investigation, Agent Sogla aptly summarized this entire case by conceding that "nothing Arling Olson did obstructed [his] investigation." There can be no other conclusion at this time.

D.  New Sheriff is Elected

Peter Johnson was elected Sheriff of Polk County in November 2010.  He offered plaintiff an opportunity to request a new assignment, but plaintiff declined because he believed he was no longer qualified to work as a patrol deputy and did not have the necessary training.

OPINION

A. Retaliation

There are a number of established principles relevant to plaintiff's First Amendment claim and some that are less clear.  Generally, a public employer may not retaliate against an employee for engaging in conduct that is protected by the First Amendment, Mt. Healthy Board of Education v. Doyle, 429 U.S. 274, 287 (1977); "an exception to that rule [exists] for positions that involve confidential or policymaking responsibilities," Moss v. Martin, 614 F.3d 707, 711-12 (7th Cir. 2010); an exception to the exception exists for adverse actions that constitute a "campaign of petty harassment."  Wallace v. Benware, 67 F.3d 655, 661 (7th Cir.1995).  In other words, "a sheriff should be entitled to place in the policymaking position of deputy sheriff loyal and trustworthy individuals who would be most effective in carrying out his electoral mandate," but the need to run an effective office cannot justify "harassment designed specifically to hinder or to disrupt a deputy in the performance of his duties."  Id. at 661-62.  However, even in cases involving alleged "harassment" rather than personnel decisions like termination or demotion, the plaintiff must show that the treatment he received was sufficiently adverse to deter a person of ordinary firmness from exercising his First Amendment rights.  Pieczynski v. Duffy, 875 F.2d 1331, 1333 (7th Cir. 1989).

Once the employee shows that he was engaging in protected conduct, he must show that his protected conduct caused the defendant's adverse treatment.  In Mt. Healthy, 429

13

U.S. at 287, the Court held that it is the plaintiff's burden to show that his protected conduct was "a motivating or substantial factor" for the adverse treatment and then the burden shifts to the defendant to show that he would have taken the same action even in the absence of an unconstitutional motive.  After several years of confusion, the Court of Appeals for the Seventh Circuit reaffirmed this holding:

> [W]e follow the approach delineated in the majority of our cases, adopted in our sister circuits, and compelled by Mt. Healthy itself, i.e., a plaintiff alleging First Amendment retaliation must prove by a preponderance of the evidence that his or her protected activity was a motivating factor in the defendant's retaliatory action. To clarify, a motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions.

Spiegla v. Hull, 371 F.3d 928, 942 (7th Cir. 2004).

Unfortunately, confusion seems to have arisen again.  In several recent cases, the court of appeals has stated that a "but for" causation standard applies to retaliation cases brought under the First Amendment, relying on Gross v. FBL Financial Services, Inc., — U.S. —, 129 S. Ct. 2343, 2351 (2009), in which the Court applied that standard to claims under the Age Discrimination in Employment Act.  Kodish v. Oakbrook Terrace Fire Protection District, 604 F.3d 490, 501 (7th Cir. 2010) ("[T]he Supreme Court has recently clarified that unless a federal statute provides otherwise, the plaintiff bears the burden of demonstrating but-for causation in suits brought under federal law."); Gunville v. Walker,  583 F.3d 979, 984 (7th Cir. 2009) ("After Gross, plaintiffs in federal suits must demonstrate but-for causation unless

14

a statute (such as the Civil Rights Act of 1991) provides otherwise."); <u>Fairley v. Andrews</u>, 578 F.3d 518, 525-26 (7th Cir. 2009) ("Some decisions . . . say that a plaintiff just needs to show that his speech was a motivating factor in defendant's decision. These decisions do not survive <u>Gross</u>, which holds that, unless a statute(such as the Civil Rights Act of 1991) provides otherwise, demonstrating but-for causation is part of the plaintiff's burden in all suits under federal law.").   However, in other cases the court continues to apply the "substantial or motivating factor" standard, without acknowledging the cases that apply <u>Gross</u>.  <u>E.g.</u>, <u>Swearnigen-El v. Cook County Sheriff's Dept.</u>, 602 F.3d 852, 861 (7th Cir. 2010); <u>Bivens v. Trent</u>, 591 F.3d 555, 559 (7th Cir. 2010).

It is not clear which decisions this court should follow.  In <u>Gross</u>, the Court did not purport to overrule <u>Mt. Healthy</u>.   Rather, the Court distinguished that case: "the constitutional cases such as <u>Mt. Healthy</u> have no bearing on the correct interpretation of ADEA claims, which are governed by statutory text."  <u>Gross</u>, 129 S. Ct. at 2352  n.6.  Thus, it seems that <u>Gross</u> is limited expressly to cases arising under a statute rather than the Constitution.  <u>Smith v. City of Allentown</u>, 589 F.3d 684, 692 (3d Cir. 2009) (applying "but for" standard to ADEA claim and "motivating factor" standard to First Amendment claim).  <u>Kodish</u>, <u>Gunville</u> and <u>Fairley</u> do not address the passage in <u>Gross</u> distinguishing <u>Mt. Healthy</u>.

The parties do not discuss this issue in their briefs; both assume that the "motivating factor" standard applies.  Because I conclude that the result of defendant's motion is the

15

same regardless which standard I apply, it is unnecessary to resolve the conflict in the context of this opinion.

1.  Political patronage exception

Plaintiff argues that the political patronage exception has no application to this case because he is not a policy maker.  (He does not argue that the political patronage exception is inapplicable on the ground that defendant denies that politics influenced any of his decisions, so I do not consider that question.)  Plaintiff is correct that defendant has not adduced any evidence regarding the duties a deputy sheriff in Polk County has that would qualify as making policy.  Thus, if I were writing on a blank slate, I likely would agree with plaintiff that defendant had failed to show that he was entitled to rely on political reasons in making assignments or promotions with respect to deputy sheriffs.

The problem with plaintiff's argument is that the Court of Appeals for the Seventh Circuit has held on a number of occasions that deputy sheriffs as a class fall within the policy maker exception without requiring the defendant to identify the responsibilities of the plaintiff in particular or deputy sheriffs within the county generally.  Upton v. Thompson, 930 F.2d 1209, 1215 (7th Cir. 1991); Dimmig v. Wahl, 983 F.2d 86, 87 (7th Cir. 1993); Wilbur v. Mahan, 3 F.3d 214 (7th Cir. 1993); Heideman v. Wirsing, 7 F.3d 659, 664 (7th Cir. 1993); Mitchell v. Thompson, 18 F.3d 425, 427 (7th Cir. 1994).  In fact, the court has

16

applied this rule to deputy sheriffs in Polk County, Wisconsin in particular, with little discussion. Wallace, 67 F.3d 655.  In Upton, 930 F.2d at 1215, the court stated that deputy sheriffs are policy makers because "[a] deputy sheriff, in implementing the Sheriff's basic policy, will make some decisions that will actually create policy. . . [D]eputies on patrol or other assignment frequently work autonomously, giving them wide latitude and discretion in the performance of their duties and in the implementation of department goals."

Without citing any of these cases, plaintiff acknowledges that deputy sheriffs "were once uniformly held to be policymakers," but he argues that "this holding did not survive Fuerst v. Clarke, 454 F.3d 770, 773 (7th Cir. 2006)."  Plt.'s Br., dkt. #34, at 4.  In that case, the court of appeals concluded that the district court had erred in granting summary judgment to the Milwaukee County sheriff on the ground that deputy sheriffs in that county are policy makers:

> [W]e must not confuse the making or advising on matters of policy with either discretion or supervision. Discretion often is exercised not only by policymaking officials but also by workers all the way down the chain of command to the bottom-most layer, which in this case would be the policeman on the beat (the equivalent to what in the Milwaukee County Sheriff's Department is called a "deputy sheriff"). That does not make a policeman a policymaker. Nor are first-line supervisors, such as police sergeants (the next rank above deputy sheriff in the Milwaukee County department and the rank to which Fuerst aspired), policymakers, even though they have more discretion than nonsupervisory employees. Senior civil servants exercise significant discretion, but it is discretion regarding how best to implement the policies formulated by their political superiors, and so it does not make them policymakers.

17

\* \* \*

> The sergeants in the Milwaukee County Sheriff's Department are not policymaking officials so understood. They have modest supervisory authority and exercise a broader discretion than the deputy sheriffs (the cops on the beat), but they do not formulate departmental policy. At least their status as policymakers is not so clear that the issue can be resolved on summary judgment.

Id. at 772-73 (citations omitted).

Plaintiff is wrong to the extent he means to argue that Fuerst overrules Wallace or any other case.  The court did not purport to be overruling any prior cases and overruling by implication is disfavored.  Cf. National Rifle Association of America, Inc. v. City of Chicago, IL, 567 F.3d 856, 857-58 (7th Cir. 2009) ("[T]he Justices have directed trial and appellate judges to implement the Supreme Court's holdings even if the reasoning in later opinions has undermined their rationale.").  In fact, because a three-judge panel decided Fuerst, the court could not have overruled anything without circulating the opinion to all active judges in the circuit, Circuit Rule 40(e); Kingstad v. State Bar of Wisconsin, 622 F.3d 708, 718 (7th Cir. 2010), something the court did not do.

It is true that the court seemed to be taking a step back from its assumption in previous cases that all deputy sheriffs are policy makers.  However, it distinguished at least some of those past cases on the ground that they involved smaller departments.  Fuerst, 454 F.3d at 773-74.  See also Ruffino v. Sheahan,  218 F.3d 697, 700 (7th Cir. 2000) (stating

18

that it "would be a remarkable extension of the policymaker line of cases to hold that the hundreds of deputy sheriffs in Cook County are all policymakers").  The court did not cite Wallace, perhaps because it did not view Wallace as containing a holding on that issue.  In that case, the court relegated to a footnote its entire discussion of the question whether Polk County deputy sheriffs are policy makers:

> Wallace argued in his brief that Upton and its progeny apply only to deputy sheriffs in Illinois because this court has never determined that Wisconsin deputy sheriffs also hold policymaking positions. (Wallace Br. at 17.) He retreated from that position at oral argument, however, conceding that our Heideman decision extends the rule of Upton to Wisconsin deputy sheriffs.

Wallace, 67 F.3d at 660 n.5.  The court seems to be assuming in this passage that all deputy sheriffs in Wisconsin are policy makers, but one might argue that the court left open for a later case the question whether a particular deputy sheriff in Polk County might not qualify as a policy maker because the plaintiff did not address the specific responsibilities of deputy sheriffs in that county.

Even if I assume that Fuerst rather than Wallace is controlling on this question, the important distinction the court makes in Fuerst is between large and small counties.  This distinction does not help plaintiff because it is undisputed that Polk County has 29 law enforcement officers.  (This may be more than the number of officers employed during the relevant events.  In Cockroft, 638 F. Supp. 2d at 1028, it was undisputed that the county had 76 employees and 28 law enforcement officers.)  This is significantly fewer than the

19

county at issue in <u>Upton</u>, 930 F.3d at 1210, which had "between 70 and 80 deputy sheriffs."

Perhaps as the case law continues to develop, the court of appeals will eschew a "small county/large county" dichotomy in favor of a more nuanced analysis. However, until that happens, I am bound by <u>Upton</u> and its progeny. Even if I concluded that <u>Fuerst</u> departs from the approach in previous cases, in the absence of an express overruling, such an approach simply would create conflicting lines of authority, defeating any argument that the law is clearly established and entitling defendant to qualified immunity. <u>Catlin v. City of Wheaton</u>, 574 F.3d 361, 369 (7th Cir. 2009) (defendants entitled to qualified immunity because, "even if the defendants had consulted a casebook prior to formulating their plan, they still would not have had fair notice"). This is consistent with my decision in <u>Cockroft</u>, a decision that plaintiff fails to discuss despite its obvious relevance and defendant's reliance on it. Qualified immunity does not apply to requests for injunctive relief, <u>Knox v. McGinnis</u>, 998 F.2d 1405, 1412-13 (7th Cir. 1993), but that limitation on the doctrine is irrelevant in this case because plaintiff is seeking damages only. Cpt. ¶¶ 901-02, dkt. #1.

Plaintiff acknowledges that defendant raised the issue of qualified immunity in his opening brief, but plaintiff argues that he waived the issue by failing to develop it. This misunderstands the parties' burdens regarding qualified immunity. "Although qualified immunity is an affirmative defense, once the defense is raised, it becomes the *plaintiff's* burden to defeat it." <u>Wheeler v. Lawson</u>, 539 F.3d 629, 639 (7th Cir. 2008) (citations

20

omitted and emphasis added).  Thus, defendant was not required to develop an argument, but plaintiff was.

## 2.  Application of the political patronage exception

In his brief, defendant argues that, under the political patronage exception, he was entitled to take politics into account when reassigning plaintiff and denying him a promotion.  This position is also consistent with Cockroft, in which I concluded that reassignment fell within the political patronage exception.  In his opposition brief, plaintiff says that, "arguably, reassigning Plaintiff Olson to the civil process server position" was part of a "campaign for petty harassment" that cannot be justified by politics.  Plt.'s Br., dkt. #34, at 7.  However, plaintiff does not develop the argument or say anything about it beyond this one sentence.

It may be that certain reassignments would fall outside the political patronage exception if the plaintiff was transferred to a position that was identical in terms of the amount or type of confidential or policy making responsibilities involved.  In that circumstance, it would be more difficult for the defendant to argue that the reassignment was needed to insure that he was surrounded by "loyal and trustworthy individuals."  Wallace, 67 F.3d at 661.  Because plaintiff does not suggest that patrol officers and civil process servers are the same in this regard, plaintiff has waived the issue and I will not consider it

21

further.

3.  Actions falling outside the political patronage exception

In his brief, plaintiff identifies a string of actions that he says were part of campaign of harassment against him, unrelated to the need to run an effective office:

- threatening to discipline plaintiff for wearing his uniform in campaign photos;

- requiring him to receive advance approval for working over time;

- giving him a "zany" schedule;

- failing to give him a taser gun or a radar unit;

- investigating him for buying a gun from a crime victim;

- "trying to prove" that plaintiff "had ignored an e-mail request from the District Attorney's office"; and

- setting in motion a criminal investigation and criminal prosecution.

(Plaintiff includes his reassignment in this list, but I have concluded that plaintiff has waived any argument that his reassignment fell outside the political patronage exception.)

With respect to many of these allegations, defendant cannot be held liable because plaintiff has failed to adduce any evidence that defendant was personally involved in the alleged conduct.  This includes plaintiff's allegations regarding the requirement to receive

22

advance approval to work overtime, changing his work schedule and failing to provide him a radar unit or a taser gun. "Section 1983 does not establish a system of vicarious responsibility. Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise." <u>Burks v. Raemisch</u>, 555 F.3d 592, 593-94 (7th Cir. 2009).

Plaintiff does not deny in his brief or proposed findings of fact that it was Lieutenant Smith's decision whether to give plaintiff a radar unit and taser gun. His only argument is that he would have been able keep those pieces of equipment if he had not been reassigned to the civil process server position, which was defendant's decision. That argument is a nonstarter because I have concluded that defendant is entitled to qualified immunity with respect to his decision to reassign plaintiff.

With respect to the issues related to overtime and scheduling, it is undisputed that Smith had responsibility for those decisions, but plaintiff points to several pieces of evidence that he says would allow the drawing of a reasonable inference that defendant played a role as well: (1) testimony by Waak that defendant would not allow Smith to adjust schedules so that officers would not have to "work days and nights in the same week," Waak Dep., dkt. #22, at 14; (2) testimony by Waak that defendant once reprimanded him for "checking in" too early; (3) testimony by O'Hare that defendant wanted sergeants to work a "rotating" schedule of "one month of days, one month of splits, one month nights," O'Hare Dep. dkt.

23

#23, at 25; (4) plaintiff's testimony that Smith said his "hands are tied" when plaintiff complained about his schedule in October 2008, Plt.'s Dep., dkt. #24, at 114; and (5) defendant's testimony that he gave plaintiff the civil process server assignment to "monitor his work product."  Def's Dep., dkt. #33-1, at 125.

The connection between this testimony and plaintiff's argument that defendant was responsible for manipulating his schedule is simply too tenuous to require a jury trial.  La Montagne v. American Convenience Products, Inc., 750 F.2d 1405, 1413 (7th Cir. 1984) (summary judgment is appropriate when "[t]he chain of inference from [plaintiff's evidence] to [defendant's] discriminatory motivation is . . .  too tenuous to permit a reasonable jury to adopt it").  See also Omnicare, Inc. v. UnitedHealth Group, Inc., 629 F.3d 697, 704 (7th Cir. 2011) ("Even on summary judgment, district courts are not required to draw every requested inference; they must only draw reasonable ones that are supported by the record."); Dorsey v. Morgan Stanley, 507 F.3d 624, 628 (7th Cir. 2007) ("The inferences [plaintiff] attempts to draw from these facts however, are based on mere speculation and thus are insufficient to overcome summary judgment."); Mid-America Tablewares, Inc. v. Mogi Trading Co., Ltd., 100 F.3d 1353, 1368 (7th Cir. 1996) ("At some point too many inferences become mere speculation.").  To begin with, none of the testimony on which plaintiff relies is related to overtime policies generally or any decisions regarding plaintiff's overtime in particular.  Although some of the other testimony relates to scheduling, Waak's

24

and O'Hare's testimony shows only that defendant may have had input into some of the policy decisions involving scheduling officers and that he enforced the schedule if he became aware of a violation.  The testimony does not suggest that defendant was involved in setting plaintiff's schedule in particular, or for that matter, that defendant had anything to do with individual schedules generally.

Plaintiff believes that Smith's comment that his "hands are tied" should be interpreted to mean that defendant was requiring Smith to change plaintiff's schedule to make it less convenient, but the comment is too vague and ambiguous to be probative. Smith says that he meant only that he needed a process server to work in the afternoons and evenings to better insure that documents would be served successfully.  Smith Decl. ¶ 4, dkt. #38.  Both defendant and Smith deny that defendant placed any restraints on Smith's scheduling, Dft.'s Decl. ¶ 11; Smith Decl. ¶ 9.  Apparently, plaintiff did not ask Smith to explain what he meant by the comment and plaintiff has not adduced any evidence that contradict's Smith's explanation now.  Finally, defendant's testimony that he wanted to "monitor [plaintiff's] work product" sheds no light on the extent to which defendant was involved in plaintiff's schedule.  At the most, this would suggest that defendant might be interested in *knowing* when plaintiff was working.  It does not show that defendant controlled plaintiff's schedule.

Defendant is entitled to summary judgment with respect to at least two of the alleged

25

actions because they did not involve adverse treatment that would deter a person of ordinary firmness from exercising his rights.  First, although defendant told plaintiff that he would be investigating plaintiff's use of his uniform in campaign photographs, defendant never took any action on that matter.  Similarly, defendant never disciplined plaintiff for failing to respond to the email from the district attorney's office.  Thus, at the most, plaintiff had to endure some questions and an unpleasant conversation with defendant, but that does not rise to the level of adverse treatment sufficient to deter a person from exercising his rights. Breneisen v. Motorola, Inc., 512 F.3d 972, 981 (7th Cir. 2008) (questions and criticisms from boss are "minor annoyances," not "materially adverse actions").

Plaintiff was not disciplined after the investigation of his purchase of a gun from a crime victim, so that incident may not be sufficiently adverse either.  (Although defendant conducted the investigation during the campaign, plaintiff does not suggest that the investigation became public or that it otherwise affected his campaign.)  In any event, plaintiff does not deny that his actions violated department policy and he identifies no suspicious circumstances surrounding the investigation, so it is not clear how a decision to investigate the matter could imply retaliation.

This leaves plaintiff's most serious allegation, that defendant retaliated against him by initiating an internal investigation of him and seeking to have him charged with perjury and obstruction of justice.  Defendant does not deny that these actions were sufficiently

26

adverse to give rise to a claim and he does not argue that his actions were too removed from the charging decision to trigger liability.   Jones v. City of Chicago, 856 F.2d 985, 993-94 (7th Cir. 1988) (police officers who gave knowingly false reports to prosecutor could be held liable for charging decision that relied on those reports).   Rather, the only question for summary judgment is whether a reasonable jury could infer that plaintiff's protected speech was one of the reasons that defendant acted as he did.   I believe that it could.

This claim arises out of a May 2002 interview that plaintiff conducted of a suspect, who wanted to give a statement "off the record."   Plaintiff agreed to this condition, but someone turned on a recording device that filmed the interview but could be controlled only from another room.   Plaintiff later gave statements to the sentencing court and to state investigators to the effect that he was not aware while he was conducting the interview that it was being recorded.   These statements were the basis for the perjury and obstruction charges.

The first fact that might raise eyebrows about defendant's motivations for instigating an investigation is the length of time that passed between plaintiff's alleged perjury, which occurred in November 2002, and defendant's recommendation to the district attorney's office, which did not occur until April 2008.   Why would defendant seek prosecution of one of his own employees for an incident that occurred more than five years earlier, long before he was sheriff?

27

There is an easy answer to that question, but it does not support defendant's motion for summary judgment.  Around the time defendant began his investigation, *he* was being investigated by the district attorney's office because of allegations that he had recorded the May 2002 interview.  Defendant admits that he was watching the interview from plaintiff's office, but he says that he has "no recollection of any involvement in the recording."   The district attorney declined to prosecute defendant for reasons the record does not make clear.

Defendant's own involvement in the May 2002 interview and his criminal investigation create an obvious conflict of interest regarding an investigation of anyone else alleged to have committed wrongdoing related to that interview.  Despite that conflict, defendant pressed ahead, not only with a department investigation, but with a request to the district attorney to press charges against plaintiff.  When the district attorney did not respond to defendant's first lengthy letter, defendant sent another letter, again urging the district attorney to prosecute plaintiff.  Defendant's zeal in pursuing the matter supports the drawing of an evidence that he had an axe to grind.  When asked why he handled the investigation of plaintiff himself, defendant's response was unconvincing: "I didn't want it to blow up and involve anybody else in my office." Dkt. #30-20, at 87.

Strong evidence exists that defendant resented plaintiff because defendant believed that plaintiff was responsible for instigating the investigation against defendant.  In fact, defendant admitted as much in both of the letters to the district attorney in which he asked

for plaintiff's prosecution.  In the first letter, defendant alleged that plaintiff's testimony at the sentencing hearing  had "the sole purpose to support his claims to defame and cast doubt as to the credibility of Investigator Ray Joy and myself."    In a second letter, defendant acknowledged that he had "a vested interest in this case as Deputy Arling Olson, and others have conspired to have me charged not only through State Court, but also through the Federal Court system."  This inference is further strengthened by the fact that defendant's investigators did not limit their questions to those about plaintiff's involvement in the May 2002 interview, but also covered subjects such as plaintiff's involvement in the investigation against defendant.

This evidence suggests that defendant's actions were motivated more by plaintiff's statements to the court and the state investigators than by any campaign activity.  Although the focus of plaintiff's complaint was alleged retaliation for opposing defendant in the sheriff's election, plaintiff argues in his brief that defendant's "hostility was generated . . . by [plaintiff's] participation in the investigations of Sheriff Moore," which "was protected expression under the First Amendment."  Plt.'s Br., dkt. #34, at 12 (citing Givhan v. Western Line Consolidated School District, 439 U.S. 410 (1979)).  See also Fairley, 578 F.3d 518, 524-25 (testifying in court protected by First Amendment); Delgado v. Jones, 282 F.3d 511, 517 (7th Cir. 2002) (participation in investigation of official misconduct may be protected by First Amendment).  In his reply brief, defendant does not argue that plaintiff

29

failed to give him adequate notice of this issue or that plaintiff's statements were outside the protection of the First Amendment because they were part of his job responsibilities, <u>Garcetti v. Ceballos</u>, 547 U.S. 410 (2006), or for any other reason.  Accordingly, I conclude that defendant has waived those arguments for the purpose of summary judgment.

The evidence is not completely one-sided.  The label on the videotape and the evidence tag were prepared by plaintiff and may undermine plaintiff's testimony that weeks or months passed before he learned that the interview had been recorded.  Even now, plaintiff's testimony is fuzzy regarding when and how he learned about the recording.  However, these competing facts and inferences simply mean that summary judgment is inappropriate and a jury trial is necessary to determine defendant's true motives.  Defendant does not argue that he is entitled to qualified immunity with respect to this claim, so I do not consider that issue.

## B.  <u>Due Process</u>

Plaintiff argues that defendant violated his due process rights "by the presentation of fabricated evidence and the withholding of exculpatory evidence."  Plt.'s Br., dkt. #34, at 12.  In particular, plaintiff says that defendant violated his right to due process in six ways:

- stating falsely that plaintiff lied at the November 2002 hearing;

- failing to disclose to the district attorney that defendant made the videotape;

- declining "to involve outside investigators in the case against" plaintiff;

- failing to disclose to the district attorney the interview that plaintiff gave department investigators in June 2008;

- failing to disclose that the label on videotape shows that defendant recorded the interview; and

- stating falsely to the district attorney that plaintiff's badge number was 917.

(In his complaint, plaintiff cites the Sixth Amendment in addition to the due process clause. I am granting defendant's motion for summary judgment as to that claim because plaintiff has not responded to defendant's argument that plaintiff does not state a claim upon which relief may be granted under the Sixth Amendment.)

The parties agree that circuit precedent bars plaintiff from bringing a malicious prosecution claim under the due process clause, Avila v. Pappas, 591 F.3d 552, 553-54 (7th Cir. 2010); Parish v. City of Chicago, 594 F.3d 551, 552-54 (7th Cir. 2009), and they agree that claims under the theory in Brady v. Maryland, 373 U.S. 83 (1963), are still permitted. Plaintiff seems to believe that the court of appeals' only objection to a malicious prosecution claim is the label and that any allegation regarding misconduct in criminal proceedings may be repackaged under Brady. This position is questionable. A claim under Brady is not for any wrongdoing that occurs in criminal proceedings, but is limited to a specific kind of injury. "[I]n order to make out a Brady claim, a plaintiff must demonstrate that the evidence

31

at issue is favorable to the accused, either because it is exculpatory or impeaching; that the evidence was suppressed by the government, either willfully or inadvertently; and that the evidence was material, that is, that there is a reasonable probability that prejudice ensued." Bielanski v. County of Kane, 550 F.3d 632, 643-44 (7th Cir. 2008). "Brady does not extend so far as to provide relief in a situation where 'a police officer makes a false statement to a prosecutor,'" Carvajal v. Dominguez, 542 F.3d 561, 567 (7th Cir. 2008) (quoting Harris v. Kuba, 486 F.3d 1010, 1017 (7th Cir. 2007)), which would seem to eliminate at least two of plaintiff's allegations involving false statements rather than failures to disclose.

Further, the "prejudice" contemplated by the courts for Brady claims is not the prosecution itself, but a guilty verdict. For example, in Ray v. City of Chicago, 629 F.3d 660, 664 (7th Cir. 2011), the court dismissed a Brady claim because the plaintiff had

> failed to identify a single instance, however, where we have allowed such suits when the individual is merely charged with a crime, but never fully prosecuted. See, e.g., Garcia v. City of Chicago, 24 F.3d 966, 971-72 (7th Cir. 1994) (holding that there was no basis for a Brady claim where the charges against an individual were nolle prossed ); Pope v. City of Chicago, No. 08-c-4715, 2009 WL 811625, at *3 (N.D. Ill. Mar. 24, 2009) ("The rule against bringing malicious prosecution claims . . . cannot be avoided by mischaracterizing malicious prosecution claims based on providing false information . . . as Brady violations for failing to disclose that the information is false.") (citing Gauger v. Hendle, 349 F.3d 354, 360 (7th Cir. 2003)). Because Ray concedes that the charges against her were dropped at her first post-arrest court appearance, her claim falls outside of the exception recognized in Brady. As Ray has not identified any other exception that would save her from the general bar against malicious prosecution claims, we are left to conclude that the district court was correct in finding her claim to be irreparably flawed.

Like <u>Ray</u>, plaintiff's charges were dropped before he was tried or even arrested and, also like <u>Ray</u>, plaintiff has not identified any other theory that would permit recovery.  <u>See also Tully v. Barada</u>, 599 F.3d 591, 594 (7th Cir. 2010) ("[W]e must reach the merits of the issue to which the parties devote their arguments, which is whether a plaintiff may assert a federal right not to be summoned into court and prosecuted without probable cause, under . . . the Fourteenth Amendment's Procedural Due Process Clause. The answer is no.")

Even if I assume that plaintiff may assert a <u>Brady</u> claim in the absence of a guilty verdict or even a trial, I agree with defendant that plaintiff has failed to identify any evidence that defendant failed to give the district attorney as required by <u>Brady</u>.  Two of defendant's alleged failings do not fall within the scope of <u>Brady</u>.  First, defendant's decision to investigate plaintiff's case himself rather than refer the matter to others may have been an exercise in poor judgment, but plaintiff fails to explain how a decision on an internal matter could be classified as suppressing evidence in a criminal prosecution.  Similarly, plaintiff fails to develop any argument explaining how defendant withheld exculpatory evidence by giving his opinion that plaintiff lied during the November 2002 sentencing hearing.  With respect to plaintiff's interview with department investigators, plaintiff fails to identify any information in that interview that was material or even exculpatory.

Plaintiff's three remaining allegations may be distilled to one, that defendant failed to disclose evidence that he and not plaintiff had made the recordings.  It is undisputed that

33

defendant gave the district attorney the videotape with the label that identifies defendant and Joy by badge number as those responsible for the recording and that in one of his letters he stated that "917" referred to Joy.  It is true that defendant did not match badge number 903 with himself in his letters.  In fact, in his first letter, defendant omitted any reference to his own badge number and instead stated incorrectly that plaintiff's own badge number, 912, was written on the label.  However, even if I assume that defendant tried to mislead the district attorney on this issue, it is difficult to argue that defendant "suppressed" information about badge numbers when they are publicly available on the internet at http://www.co.polk.wi.us/law/Staff.asp (last visited March 29, 2011). Cf. Carvajal, 542 F.3d at 567-68  ("Suppression does not occur when the defendant could have discovered it himself through 'reasonable diligence.'").

Further, the special prosecutor who filed the criminal complaint has testified that he was aware that defendant's badge number was 903 and plaintiff's badge number was 912, which undermines any argument that defendant's actions affected the decision to charge plaintiff.  Berg Decl. ¶ 5-6, dkt. #42.  Also undermining any prejudice argument is the fact that plaintiff was not charged with recording the tape, but with lying about his knowledge that the tape had been recorded.  In the criminal complaint, the special prosecutor relied on the evidence tag and plaintiff's handwriting on the label as a basis for probable cause.  Dkt. #42-1.  Although the prosecutor stated incorrectly in the complaint that plaintiff's badge

number is 917, defendant cannot be blamed for that because he stated in his first letter that 917 was Sergeant Joy's badge number.  Accordingly, I conclude that plaintiff has failed to satisfy the elements of a <u>Brady</u> claim with respect to any of the alleged failures to disclose exculpatory evidence.

## ORDER

IT IS ORDERED that

1.  Defendant Timothy Moore's motion for summary judgment, dkt. #12, is DENIED with respect to plaintiff Arling Olson's claim that defendant retaliated against him in violation of the First Amendment by conducting an internal investigation and recommending that plaintiff be criminally prosecuted.  Defendant's motion is GRANTED in all other respects.

2.  Plaintiff's motion for leave to file a declaration in response to defendant's reply submissions, dkt. #46, is DENIED as unnecessary.

Entered this 31st day of March, 2011.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

35